United States District Court
Southern District of Texas
**ENTERED**
November 20, 2019
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL REID, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-18-4562 |
| | § | |
| ANDREW SAUL,[1] | § | |
| COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[2] are Defendant's Cross-Motion for Summary Judgment (Doc. 12) and Plaintiff's Cross-Motion for Summary Judgment (Doc. 14). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendant's motion be **GRANTED** and Plaintiff's motion be **DENIED**.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or "Defendant") regarding Plaintiff's claim for disability insurance benefits under

---

[1] Nancy Berryhill was the Acting Commissioner of the Social Security Administration ("SSA") at the time that Plaintiff filed this case but no longer holds that position. Andrew Saul is now Commissioner of the SSA and, as such, is automatically substituted as the defendant in this case. See 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[2] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 10, Ord. Dated Feb. 5, 2019.

Title II of the Social Security Act ("the Act").

## A.  **Vocational and Medical History**

Plaintiff was born on February 20, 1980, and was thirty-six years old on the alleged disability onset date of November 27, 2016.[3]  Plaintiff graduated from high school and worked in security/special forces and in human resources while serving for seventeen years in the U.S. Air Force.[4]  Plaintiff medically retired from service in November 2016.[5]

Based on evaluations conducted in May 2016, the U.S. Department of Veterans Affairs ("VA") rated Plaintiff's service-connected disabilities at 100 percent, listing the following as contributing conditions: (1) post-traumatic stress disorder ("PTSD") (70%); (2) sleep apnea (50%); (3) degenerative arthritis of the spine (20%); (4) limited arm motion (20%); (5) intervertebral disc syndrome (10%); (6) paralysis of the sciatic nerve (10%); (7) allergic or vasomotor rhinitis (10%); (8) limited jaw motion (10%); and (9) tinnitus (10%).[6]  The following conditions received ratings of 0%:  knee condition; benign skin

---

[3]      See Doc. 9, Tr. of the Admin. Proceedings ("Tr.") 54, 212, 231, 260. In his application, Plaintiff alleged that he was unable to work as of September 1, 2016.  See Tr. 212.  However, he also reported that his U.S. military service did not end until November 27, 2016.  See Tr. 212.

[4]      See Tr. 55-57, 98-99, 121-22, 231, 244, 260-61.

[5]      See Tr. 55.

[6]      See Tr. 392-504.

neoplasm; migraine headaches; tendon inflammation; and acne.[7]

Plaintiff submitted medical records dated as far back as 2006. Prior to the alleged onset date, Plaintiff was diagnosed with right knee strain, left knee tendonitis/tendonosis, degenerative arthritis of the cervical spine, and PTSD.[8]   Radiography of Plaintiff's knees dated six months prior to his alleged onset date revealed no impairment of any sort.[9]   The record is devoid of any time-relevant medical evidence of a knee condition.   The court, therefore, only focuses on the medical records concerning Plaintiff's back condition and PTSD that are relevant to the alleged disability period.

### 1.   Physical Impairment--Back Condition

On November 23, 2016, a few days prior to the alleged onset date, Plaintiff saw a chiropractor, complaining of neck and lower back pain.[10]   The examination indicated tenderness in the cervical and lumbosacral spine and somatic dysfunction in both.[11]   The chiropractor performed adjustments and discussed medication and treatment alternatives with Plaintiff.[12]

---

[7]   Id.

[8]   See Tr. 357, 364, 409, 420, 453.

[9]   See Tr. 334-35.

[10]   See Tr. 1312.

[11]   See Tr. 1312-13.

[12]   See Tr. 1313.

On November 29, 2016, Plaintiff rated his pain at seven on a ten-point scale.[13]  At an appointment on May 31, 2017, Plaintiff complained of chronic lower back pain.[14]  In addition to continuing nonsteroidal anti-inflammatory medication to be taken as needed, the staff physician ordered a transcutaneous electrical nerve stimulation ("TENS") unit and two topical pain relievers.[15]  The physician recommended follow up in six months.[16]

On May 31, 2017, Plaintiff attended a follow-up appointment, again reporting chronic lower back pain.[17]  The doctor noted that prior x-rays of the spine were "basically negative" and that magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine performed earlier in the year indicated degenerative disc disease.[18]  The assessment and treatment plan remained the same as the prior appointment including the recommendation of following up in six months.[19]

On August 16, 2017, Plaintiff saw Stephanie Jones, M.D., ("Dr. Jones") for a pain consultation on referral from Plaintiff's

---

[13]    See Tr. 373.

[14]    See Tr. 374.

[15]    See Tr. 376.

[16]    See id.

[17]    See Tr. 1239-42.

[18]    Tr. 1242.

[19]    See id.

chiropractor.[20]  Plaintiff presented with lower back and neck pain that radiated down his lower extremities to his feet.[21]  He reported that the pain began on July 16, 2017, when he was involved in a motor-vehicle accident.[22]  Plaintiff described his pain as "sharp, aching, throbbing sore [sic]" and rated its level at "moderate[.]"[23] Prior to the accident, Plaintiff said, the chronic pain in his lower back was improving.[24]  When asked, Plaintiff reported that his sleep quality was poor due to pain and that he did not engage in a home exercise program.[25]

Dr. Jones reviewed MRIs of the cervical and lumbar spine dated July 27, 2017, which revealed disc herniation in the cervical spine and disc bulges in the lumbar spine.[26]  On examination, Dr. Jones noted normal gait, stance, and motor strength of upper and lower extremities and negative straight leg raising.[27]   Dr. Jones diagnosed Plaintiff with neck and back pain, discontinued Plaintiff's prescription pain medication, and recommended continuing chiropractic physical therapy.

---

[20]    See Tr. 1965.

[21]    See id.

[22]    See id.

[23]    Id.

[24]    See id.

[25]    See id.

[26]    See Tr. 1937-39, 1941, 1966.

[27]    See Tr. 1967.

Plaintiff saw Dr. Jones again on September 19, 2017, for further evaluation.[28]  On that occasion, Plaintiff reported that the pain in his lower back, bilateral lower extremities, neck, bilateral shoulder, and posterior thoracic area was seven on a ten-point scale when medicated but was a ten without medication and indicated that it was worse since his initial visit.[29]  He stated that it lasted most of the day but that medication and ice alleviated the pain and that his sleep quality was fair.[30]  Dr. Jones recommended lumbar epidural steroid injections, the first of which was administered on September 22, 2017.[31]

On October 4, 2017, Plaintiff attended a follow-up appointment when he reported that his condition had improved since the last visit but that his pain levels were three on a ten-point scale with medication and nine without medication.[32]  He told Dr. Jones that he did not feel that the pain relief was adequate.[33]  However, "in going over things," Dr. Jones noted, "legs symptoms seem gone . . . so he is doing quite a bit better[.]"[34]  Dr. Jones recommended repeating the epidural steroid injection and did so on October 10,

---

[28]    See Tr. 1962.

[29]    See id.

[30]    See id.

[31]    See Tr. 1964.

[32]    See Tr. 1954.

[33]    See id.

[34]    Tr. 1956.

2017.[35]

On November 1, 2017, Plaintiff saw Dr. Jones for further evaluation.[36]  On that day, Plaintiff estimated his pain level at one on a ten-point scale with medications and at four without medications.[37]  Plaintiff reported that his lower back pain had been improving and that his sleep quality was good.[38]  He said he felt the pain relief was adequate, reporting an eighty-five percent relief after the second injection and stating that he had not taken any prescription pain medication "for a while[.]"[39]  When asked about side effects, Plaintiff said that he was experiencing none.[40]  Dr. Jones informed Plaintiff that he should schedule another appointment when needed.[41]

On December 14, 2017, Plaintiff saw Dr. Jones for pain management and reported that the pain in his lower back and hip had improved overall since his first appointment.[42]  Plaintiff reported that his pain level with medication was four on a ten-point scale.[43]

---

[35]    See Tr. 1949-53, 1956.

[36]    See Tr. 1945.

[37]    See id.

[38]    See id.

[39]    See id.

[40]    See id.

[41]    See Tr. 1947.

[42]    See Tr. 1942.

[43]    See id.

On examination, Dr. Jones found Plaintiff's gait and stance to be normal.[44]  Dr. Jones made no changes in Plaintiff's medication or treatment and advised him to return when needed.[45]

On January 15, 2018, Plaintiff sought treatment at Alamo Neurological Institute on referral from Dr. Jones.[46]  Plaintiff reported "cervical pain, stiffness, muscle spasms, and paresthesias with right shoulder radiculopathy, right finger paresthesias, and right hand weakness," all of which he said began after the motor-vehicle accident in July 2016.[47]  Plaintiff also reported:

> headaches three days a week, dizziness, [temporomandibular joint ("TMJ")] pain, facial tingling, blurry vision, double vision, vertigo, memory loss, anxiety, depression, mood swings, . . . dysphasia[,] thoracic and lumbar pain, stiffness, muscle spasms, . . . paresthesias with bilateral lower extremity radiculopathy and weakness[,] . . . bilateral buttocks and bilateral toe paresthesias, bilateral hamstring and bilateral toe muscle spasms, and decreased balance.[48]

Plaintiff told the doctor that he had undergone two lumbar epidural steroid injections with limited relief.[49]

On physical examination, the doctor observed decreased range of motion in Plaintiff's back and neck, mild tenderness in his

---

[44]   See Tr. 1944.

[45]   See id.

[46]   See Tr. 1937.

[47]   Tr. 1938.

[48]   Id.

[49]   See id.

neck, and muscle weakness.[50] Plaintiff's sensation was intact, and strength in his upper and lower extremities was 5/5 except for bilateral biceps and bilateral handgrips which was 4/5.[51]

Based on the examination and the results of the July 2017 MRIs, the doctor recommended that Plaintiff "return to pain management to complete a full series of cervical epidural steroid injections" and that he perform lumbar stretching and strengthening exercises at home.[52]

### 2.  Mental Impairment--PTSD

On December 12, 2016, Plaintiff attended a psychiatry outpatient intake consultation.[53]  At that time, he was not on any medication to address PTSD.[54]  The appointment note stated:

> [Plaintiff] reports daily episodes of avoidance, interpersonal difficul[ti]es, hypervigilence, instrusive thoughts, and nightmares multiple times weekly.  He reports occasional depressive symptoms, but anxiety predominates.  He reports that he is expecting his first child any day now[] and is excited about this[] but endorses a h[e]ightened level of stress [secondary to] getting the home ready for a child[] and increased demands from his wife.  [H]e denies manic or psychotic symptoms. . . . He reports appropriate sleep, energy, and appetite.  He denies current or historical [suicidal ideation] or self harm.[55]

---

50    See Tr. 1937-38.

51    See Tr. 1938.

52    Id.

53    See Tr. 356-63.

54    See Tr. 357.

55    Id.

A mental status examination ("MSE") was within normal limits with anxious mood and fair insight and judgment.[56]  The doctor continued the PTSD diagnosis, prescribed Zoloft (generically known as sertraline), referred Plaintiff for psychotherapy orientation, and instructed Plaintiff to return in one month.[57]

On December 19, 2016, Plaintiff attended a psychotherapy orientation session at which time, results of an MSE were normal.[58] Beginning on December 21, 2016, the VA attempted to schedule Plaintiff for the recommended psychotherapy, eventually making contact on December 27, 2016.[59]  Plaintiff declined services, stating that he previously had been evaluated and was "not interested in any continuing treatment."[60]  The VA administratively discontinued Plaintiff from the therapy program.[61]

On January 19, 2017, a VA psychiatrist saw Plaintiff for medication management and supportive therapy.[62]  Plaintiff reported that he would become depressed and irritable after a trigger such as an interaction with someone or a loud noise and that the

---

[56]   See Tr. 359-60.

[57]   See Tr. 360.

[58]   See Tr. 381-82.

[59]   See Tr. 352-53.

[60]   Tr. 353 (emphasis omitted).

[61]   See id.

[62]   See Tr. 377-81.

resulting "funk" lasted a few days.[63]   Overall, he estimated, he felt "down or irritable about half the time."[64]   Plaintiff denied suicidal and homicidal ideation.[65]   Plaintiff reported that his son was born in December, and Plaintiff's sleep had been "more interrupted due to waking to care for the baby" and lighter to ensure that he heard if his son awoke.[66]   Plaintiff also explained that he did not want to begin psychotherapy while facing the demands of caring for a newborn.[67]

Plaintiff said that he had not noticed a difference in the month he had been taking Zoloft but that he had not experienced any side effects other than a stomach issue one day when he first began the prescription.[68]   The results of an MSE were normal other than describing his mood as "not too good."[69]   The psychiatrist increased Plaintiff's dosage of Zoloft and instructed Plaintiff to return in one month.[70]

On May 23, 2017, a VA clinical team reviewed Plaintiff's medical chart and staffed his case to determine whether he

---

[63]     Tr. 377.

[64]     Id.

[65]     See id.

[66]     Tr. 377-78.

[67]     See Tr. 279.

[68]     See Tr. 378.

[69]     See Tr. 379.

[70]     See Tr. 379-80.

qualified for a caregiver support program, which provided personal care services for veterans who had sustained a serious injury in the line of duty and were unable to perform one or more ADLs and/or needed supervision due to symptoms or residuals of injury.[71]   The clinical team determined that Plaintiff was not eligible because he was able to perform ADLs and his daily environment was free of any safety risks.[72]

Plaintiff's next appointment with a VA psychiatrist was in June 2017.[73]   Plaintiff appeared with his infant son and reported a perceived benefit from the increased dosage of Zoloft with no additional side effects.[74]   Plaintiff indicated that his symptoms were stable overall and that he was coping well.[75]   He also stated that he cared for his son during the day and enjoyed the time but that he continued to experience difficulty falling asleep with interruptions by his son and with nightmares once every two weeks.[76]

Plaintiff denied manic or psychotic symptoms, thoughts of death, or suicidal ideation.[77]   An MSE was within normal limits with

---

[71]   See Tr. 1243.

[72]   See Tr. 1243-44.

[73]   See Tr. 370-73.

[74]   See Tr. 370.

[75]   See id.

[76]   See id.

[77]   See id.

anxious mood and fair insight and judgment.[78]   The psychiatrist
continued Zoloft at the same dosage and instructed Plaintiff to
return in three months.[79]

On September 19, 2017, Plaintiff reported to Dr. Jones that he
was feeling stress but no anxiety, depression, sleep disturbance or
suicidal ideation and that he was not experiencing any memory
loss.[80]   An abbreviated MSE on that date was normal.[81]   On October
4, 2017, Plaintiff reported to Dr. Jones that he was feeling no
stress, anxiety, depression, sleep disturbance or suicidal
ideation.[82]   An abbreviated MSE was again normal.[83]

**B.   SSA Administrative Process**

On December 1, 2016, Plaintiff applied for disability
insurance benefits claiming an inability to work due to back
injury, degenerative arthritis of lumbosacral spine, PTSD, bipolar
disorder, obstructive sleep apnea, fibromyalgia, right shoulder
impingement syndrome, neck injury, bilateral knee injury, and
arthralgia of the TMJ.[84]

Throughout the administrative process, Plaintiff and his wife

---

[78]   See Tr. 371-72.

[79]   See Tr. 372.

[80]   See Tr. 1962.

[81]   See Tr. 1964.

[82]   See Tr. 1954.

[83]   See Tr. 1956.

[84]   See Tr. 87-89, 101, 103, 212, 260.

submitted function reports and other statements for the SSA's consideration.[85]   Among the written subjective testimony was one of Plaintiff's reports in which he provided lengthy remarks on his functionality.[86]   In that report and others, Plaintiff and his wife indicated that Plaintiff was *capable* of: (1) feeding and bathing the pet dog; (2) dressing his infant child; (3) transporting the children to/from daycare and school; (4) assisting with homework; (5) playing games with the children; (6) spending time with family; (7) watching television and movies; (8) vacuuming and dusting; (9) washing dishes; (10) mowing grass; (11) completing minor household repairs; (12) preparing microwavable or simple meals; (13) cleaning his room; (14) working on his car; (15) toileting and bathing on his own; (16) cutting his own hair; (17) shaving; (18) shopping online for electronics, books, and family essentials; (19) occasionally shopping in stores; (20) paying bills, counting change, and handling finances; (21) ordering medication refills; (22) walking for ten to fifteen minutes; (23) following written instructions; (24) driving; (25) going alone to doctor appointments; and (26) attending church.[87]

In other representations of Plaintiff's activities of daily

---

[85]   See Tr. 234-41, 251-58, 277-84, 308-23.  The record also contains an undated statement from Plaintiff's wife, but it repeats the information she provided in a January 2018 letter to the ALJ.  Compare Tr. 328-32 with Tr. 308-14.

[86]   See Tr. 315-23.

[87]   See Tr. 235, 237-38, 252-55, 257, 278, 280-81, 308-13, 315-19, 321.

living ("ADLs"), Plaintiff and his wife suggested that Plaintiff was much more limited.  For example, they reported that he was *incapable* of (1) caring for the dog; (2) watching television and movies; (3) performing household chores and yard work; (4) preparing meals; (5) toileting or bathing on his own; (6) remembering to groom himself; (7) remembering to take medications; (8) managing/handling money (other than paying bills); (9) maintaining attention; (10) finishing tasks and activities; (11) getting along with authority figures and others; (12) following written or spoken instructions; (13) handling stress and changes in routine; (14) driving; (15) walking without a cane; (16) going outside alone; and (17) going to any outside activities or events.[88]

On March 17, 2017, the SSA found Plaintiff not disabled at the initial level of review.[89]  The medical consultants who reviewed Plaintiff's record determined that he suffered from a trauma- and stress-related disorder and a back disorder, both of which the consultants found to be severe.[90]

Although only one psychiatric impairment was found to be severe, the psychiatric consultant considered three mental impairments identified in the regulations as presumptively

---

[88]    See Tr. 235-37, 240, 253-54, 256-57, 278-83, 308-14, 317-22.

[89]    See Tr. 87-100, 128.

[90]    See Tr. 87, 91.

15

disabling ("Listings")[91]--specifically Listing 12.04 for depressive, bipolar, and related disorders, Listing 12.07 for somatic symptom and related disorders, and Listing 12.15 for trauma- and stressor-related disorders.[92]  The psychiatric consultant concluded that the evidence did not establish the required criteria of any of the three Listings considered.[93]  Specifically, with regard to paragraph B criteria, he opined that Plaintiff was mildly limited in one area of functioning and moderately limited in the other three.[94]  The psychiatric consultant pointed to Plaintiff's capability with regard to ADLs and to the gap in his mental-health treatment in concluding that "the alleged severity of impairment [was] not fully consistent with objective medical evidence and other [evidence and] . . . [t]he intensity, persistence, and limiting effects of [his symptoms] . . . would not wholly compromise [the] ability to function in a work setting independently, appropriately, and effectively and on a sustained basis."[95]

Concerning Plaintiff's Mental RFC, the psychiatric consultant opined that Plaintiff was not more than moderately limited in his ability to perform any work activity on a sustained basis.[96]  The

---

[91]    See 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[92]    See Tr. 91-93.

[93]    See id.

[94]    See Tr. 92.

[95]    Id.

[96]    See Tr. 96-97.

16

reviewer concluded that Plaintiff "can understand, remember, and carry out detailed non-complex instructions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in a routine work setting."[97]

The physical consultant did not address any Listing but opined that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of six hours per eight-hour workday, sit about six hours per eight-hour workday, occasionally climb ramps/stairs, balance, stoop, kneel, crouch, crawl but never climb ladders/ropes/scaffolds.[98]   The consultant found no manipulative, visual, communicative, or environmental limitations.[99]   She concluded that Plaintiff's alleged limitations were only partially consistent with the record.[100]

On May 24, 2017, Plaintiff requested reconsideration of the initial decision.[101]   The examiner recommended that the SSA hire a medical consultant to perform consultative examination to assess the severity of Plaintiff's physical impairment due to the alleged worsening of symptoms.[102]   Thereafter, Plaintiff and his attorney

---

[97]     Tr. 98.

[98]     See Tr. 94-95.

[99]     See Tr. 95.

[100]    See id.

[101]    See Tr. 131.

[102]    See Tr. 106.

17

requested that the consultative examination be rescheduled, and the SSA accommodated that request.[103]   However, the attorney also informed the SSA that Plaintiff had undergone more recent medical treatment and agreed that the consultative examination should be canceled until the SSA could obtain and review the additional records, possibly avoiding the need for an additional examination.[104]

In mid-October 2017, the SSA again found Plaintiff not disabled upon reconsideration.[105]   On reconsideration review, the SSA noted that Plaintiff had not reported any change in his physical or mental conditions or any new physical or mental conditions.[106]   A psychologist, a psychiatrist, and a physician evaluated Plaintiff's impairments.[107]

The reviewing medical consultants provided a detailed discussion of the medical evidence, including the VA disability rating, and identified the trauma- and stress-related disorder and the back disorder as severe.[108]   The reviewing psychologist concurred with the prior reviewer that the record did not establish that Plaintiff was disabled pursuant to the criteria of Listing

---

[103]   See id.

[104]   Tr. 107; see also Tr. 285.

[105]   See Tr. 101-127, 132-36.

[106]   See Tr. 103.

[107]   See Tr. 111-21.

[108]   See Tr. 108-11.

12.04, Listing 12.07, or Listing 12.15, and the reviewing psychiatrist, who considered only Listing 12.15, found Plaintiff to be even less limited in functioning.[109]   Specifically, the psychologist found Plaintiff to be mildly limited in one of the four areas of mental functioning and moderately limited in the other three, while the psychiatrist found him mildly limited in two areas and moderately limited in the other two areas.[110]   The psychologist also concurred with the prior reviewer on Plaintiff's mental RFC, but the psychiatrist found Plaintiff much less limited overall.[111]   The reviewing medical consultant concurred with the prior physical RFC assessment.[112]

Plaintiff requested a hearing before an ALJ.[113]   In a disability report completed on appeal, Plaintiff reported no change in any of his impairments and no new conditions.[114]   The ALJ granted Plaintiff's request and scheduled the hearing on April 6, 2018.[115]

C.  **Hearing**

At the hearing, Plaintiff and a vocational expert testified.[116]

---

[109]   Compare Tr. 111-12, 113 with Tr. 91-92.

[110]   See Tr. 112-13.

[111]   Compare Tr. 117-21 with Tr. 96-97.

[112]   Compare Tr. 115-16 with Tr. 94-95.

[113]   See Tr. 138.

[114]   See Tr. 290.

[115]   See Tr. 182.

[116]   See Tr. 48-85.

Plaintiff was represented by an attorney.[117]  The ALJ noted that the medical records since the alleged onset date primarily addressed Plaintiff's back issues.[118]  Plaintiff's attorney indicated that Plaintiff's back impairment and PTSD were the primary impairments affecting Plaintiff's ability to work.[119]

The ALJ began the examination of Plaintiff by confirming personal information and work history.[120]  In addition to describing his jobs with the military, Plaintiff reported that, while employed, he was not able to work well with others, was "messing up" on his work, could not concentrate due to medications, and argued with his superiors and subordinates.[121]

When the ALJ asked about ADLs, Plaintiff testified that he spent most of his day lying in bed or on the couch watching television due to back pain.[122]  Plaintiff reported that he did not drive and confirmed that he shopped online, enjoyed watching television and movies, and attended church about once a month.

Plaintiff described his PTSD symptoms:

> It [sic] was extreme anxiety; irritable; nervousness; I'm always on edge; always wondering about stuff that I can't control.  It's hard for me to be

---

[117]  See Tr. 48.

[118]  See Tr. 53.

[119]  See id.

[120]  See Tr. 54-58.

[121]  Tr. 57-58; see also Tr. 70-71.

[122]  See Tr. 58.

> around crowds of people or around people in general
> because I'm thinking everybody is out to get me. I have
> flashbacks of being on the battlefield when I was
> deployed in the military.[123]

Plaintiff admitted that he had not received treatment for PTSD since sometime in 2017.[124] Plaintiff explained that he was embarrassed to get mental-health treatment.[125] He reported that he had pushed away all of his friends.[126]

The ALJ noted that the VA had assessed Plaintiff a twenty percent disability rating for spinal degenerative arthritis.[127] Plaintiff summarized the symptoms related to his back injury, which first occurred when he was thrown off of military vehicle during an improvised explosive device (IED) explosion and later was exacerbated in the automobile accident:

> With my back and my neck issues; the fibromyalgia;
> and the pain that radiates from my back down to my legs,
> it's hard for me to even stand; and I just get to the
> point where I'm just -- I just [lie] on the floor because
> I'm in so much pain. I can't brush my teeth, I can't put
> my socks on. It's the simple things that people take for
> granted[;] it's hard for me.[128]

The ALJ confronted Plaintiff regarding statements to Dr. Jones that he experienced eighty-five percent relief from pain with no side

---

123    Tr. 59-60.

124    See Tr. 62-63.

125    See Tr. 66-67.

126    See Tr. 70.

127    See Tr. 61.

128    Tr. 60; see also Tr. 61-62.

effects from lumbar injections.[129]   Plaintiff responded that he actually was "in more pain[]" but misinformed the doctor so that he "wouldn't have to go back there again."[130]

At the hearing, Plaintiff also complained of knee and shoulder pain.[131]  He reported that he had received treatment for his knees in 2018.[132]  Plaintiff's attorney asked Plaintiff about the help he received from his wife, and he said:

> Basically with my everyday needs[.] She helps cook[,] clean; . . . she takes care of the kids; she makes sure I take my medication and lay[s] them out for me. She's just there for moral support, tell[s] me everything's going to be all right. . . . To wash, wash my hair and help, help bathe me; help put my clothes on; my shoes, something as little as . . . tying my shoes, she helps me with that; she helps me in and out of bed, or off the couch if I [am] . . . having trouble getting up.[133]

The ALJ queried further, and Plaintiff said that his wife returned home midday to prepare lunch for him and to check on his mental state.[134]  He also confirmed that she had to remind him to bathe, brush his teeth, and take his medication.[135]

The ALJ turned to the vocational expert, who classified

---

[129]   See Tr. 74.

[130]   Tr. 75.

[131]   See Tr. 60-61.

[132]   See Tr. 63.

[133]   Tr. 63-64.

[134]   See Tr. 64-65.

[135]   See Tr. 68-69.

Plaintiff's prior job in special forces as semiskilled and heavy and in human resources as skilled and sedentary.[136]  The ALJ then posed a hypothetical individual of Plaintiff's same age, education, and work experience who was capable of: lifting ten pounds occasionally; lifting less than ten pounds frequently; standing and/or walking for up to two hours in an eight-hour workday; sitting for up to six hours in an eight-hour workday; occasionally climbing ramps and/or stairs, balancing, stooping, kneeling, crouching, and crawling; and never climbing ladders, ropes, or scaffolds.[137]  The ALJ added a sit/stand option; the limitation of simple instructions; the limitation of only occasional interaction with coworkers and supervisors; the limitation of no interaction with the public; and the limitation of simple and routine tasks involving only simple work-related decisions with few, if any workplace changes and further noted the ability to perform simple tasks with or without supervision; the ability to attend and concentrate for simple tasks; and the ability to attend to a routine and maintain a schedule.[138]

The vocational expert confirmed that such an individual could not perform any of Plaintiff's past relevant work but that the individual could perform the work of an optical goods assembler, a

---

[136]   See Tr. 77.

[137]   See Tr. 77-78.

[138]   See Tr. 78.

table worker, or a medical product assembler, and that sufficient
jobs existed in the national economy for each.[139]  The ALJ added the
limitation of cane usage outside of the work station, and the
vocational expert indicated that it would not change his answer
regarding available jobs.[140]  The ALJ also inquired about customary
tolerances for tardiness or absenteeism and for being off task, for
which the vocational expert provided upper limits for
employability.[141]

Plaintiff's attorney took the opportunity to inquire whether
certain limitations not recognized by the ALJ, as well as other
workplace behaviors, would prevent Plaintiff's employment.[142]
Specifically, Plaintiff's attorney asked about customary tolerances
for recumbent rest, altercations, and leaving the work premises
outside of normal breaks.[143]  The vocational expert responded that
employers offer "little accommodation for [lying] down," do not
tolerate altercations, and address leaving the workplace as
absenteeism.[144]  Plaintiff's attorney also inquired how the ability
to handle only less-than-occasional changes in the workplace or
workplace stress, to which the vocational expert responded that all

---

[139]    See Tr. 78-79.

[140]    See Tr. 83.

[141]    See Tr. 79.

[142]    See Tr. 79-81.

[143]    See Tr. 79-80.

[144]    Tr. 80; see also Tr. 81.

24

competitive employment would be eliminated.[145]

Plaintiff's attorney confirmed that the vocational expert considered only the factors and limitations presented in the ALJ's hypothetical questions.[146]   When asked by the ALJ whether the testimony was consistent with the Dictionary of Occupational Titles ("DOT"), the vocational expert confirmed that it was with the exception of absenteeism, being off task, workplace altercations, and leaving the workplace, which, he said, were not addressed in the DOT.[147]   For those, the vocational expert said that he relied on his "experience in placing individuals in the national and regional economy."[148]

### D.   <u>Commissioner's Decision</u>

On June 12, 2018, the ALJ issued an unfavorable decision.[149] The ALJ found that Plaintiff had not engaged in substantial gainful activity since November 27, 2016, the alleged onset date.[150]   The ALJ recognized the following impairments as severe: (1) cervical and lumbar spine degenerative disc disease; and (2) PTSD.[151]   He explained that the evidence demonstrated the physical impairment

---

[145]   <u>See</u> Tr. 81.

[146]   <u>See</u> <u>id.</u>

[147]   <u>See</u> <u>id.</u>

[148]   <u>Id.</u>

[149]   <u>See</u> Tr. 28-47.

[150]   <u>See</u> Tr. 33.

[151]   <u>See</u> <u>id.</u>

limited Plaintiff's "ability to walk, stand, sit, lift, and carry and produce[d] postural limits as well[]" and the mental impairment affected Plaintiff's "ability to understand, remember, and carry out instructions and respond appropriately to others."[152]  Although the ALJ recognized that Plaintiff had other impairments, the ALJ did not find them, either singly or in combination, to be severe.[153]

At the Listing step, the ALJ found that Plaintiff did not meet the requirements of any Listing, specifically addressing Listing 1.04 for disorders of the back and Listing 12.15 for trauma- and stressor-related disorders.[154]  The ALJ found that Listing 1.04 was not met because the medical records did not evidence "nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis" and did not evidence "corresponding motor and sensory or reflex deficit" or positive sitting and supine straight leg raising.[155] The medical records, according to the ALJ, also lacked evidence of "an inability to ambulate effectively."[156]

Turning to Listing 12.15, the ALJ provided a sufficiently thorough discussion of the criteria with references to the medical

---

[152]   Tr. 33-34.

[153]   See Tr. 34.  The ALJ found that, despite Plaintiff's subjective complaints, his knee, shoulder, and TMJ issues were not medically determinable impairments.  See id.

[154]   See Tr. 34-36.

[155]   Tr. 34.

[156]   Id.

records and Plaintiff's self-reported ADLs.[157]  The ALJ concluded
that Plaintiff was moderately limited in these areas of mental
functioning:  (1) "understanding, remembering, or applying
information;" (2) "interacting with others;" and (3)
"concentrating, persisting, or maintaining pace."[158] For the fourth
area, adapting or managing oneself, the ALJ found Plaintiff only
mildly limited.[159]  He further determined that the medical records
did not evidence "a serious and persistent disorder over a period
of at least 2 years with evidence of both . . . [m]edical
treatment, mental health therapy, psychosocial support(s), or a
highly structured setting(s) that is ongoing and that diminishes
the symptoms and signs of his mental disorder . . . [or] . . .
[m]arginal adjustment."[160]

     The ALJ found Plaintiff's RFC allowed him:

     to perform sedentary work . . . with further limitations
     of: lift 10 pounds occasionally, lift less than 10 pounds
     frequently, stand/walk for 2 hours in an 8-hour workday,
     and[] sit for up to 6 hours in an 8-hour workday;
     occasionally climb ramps/stairs, never climb
     ladders/ropes/scaffolds; occasionally balance, stoop,
     kneel, crouch and crawl; and[] be able to change
     positions after 30 to 60 minutes of being in one
     position.  The individual can understand and follow
     simple instructions, perform simple tasks with or without
     supervision, can attend and concentrate for simple tasks,
     attend to a routine and maintain a schedule; interact

---

[157]    See Tr. 34-36.

[158]    Tr. 35.

[159]    See id.

[160]    Tr. 35-36.

occasionally with co-workers and supervisors, but should
not interact with the public; work should be limited to
simple routine tasks, involving only simple, work-related
decisions[] with few, if any[,] work place changes.[161]

In his explanation of this RFC, the ALJ thoroughly discussed
Plaintiff's function reports, hearing testimony, and medical
treatment.[162]   Although the ALJ found that Plaintiff's medically
determinable impairments could reasonably be the source of
Plaintiff's symptoms, the ALJ also stated:

There is relatively little in the way of objective
findings and longitudinal treatment records in comparison
to the claimant's allegations of disabling pain and
attendant functional limitation[,] and the claimant's
allegations are disproportionate to the type and severity
of abnormal findings in evidence as well as his limited
and conservative treatment course to date.[163]

The ALJ recounted Plaintiff's hearing testimony that he had
lied to his doctor about post-injection improvement of back pain in
order to avoid additional injections.[164]   The ALJ found Plaintiff's
explanation "hard to believe[,]" stating:

If [Plaintiff] disliked injections into his spine[,] he
could have simply refused to consent to further
injections without resorting to the reported ruse.   It
can only be concluded that he was either disingenuous in
his repeated statements to his pain management physician
or he was disingenuous in his testimony about the
accuracy of those statements.[165]

---

[161]     Tr. 36.

[162]     See Tr. 36-41.

[163]     Tr. 38.

[164]     See Tr. 39.

[165]     Id.

28

The ALJ gave partial weight to the statements of Plaintiff's wife, which the ALJ characterized as relating her "subjective perceptions[,]" not "reflect[ing] the observations of an individual with medical training or experience[]" and "not wholly consistent with the objective evidence and other evidence of record[.]"[166]

The ALJ specifically noted that the record lacked evidence of routine, specialized mental health treatment, which, "when viewed in conjunction with the limited amount and type of abnormal objective findings and [Plaintiff's] reported [ADLs] and social functioning[,]" indicated less severe PTSD than alleged.[167] Regarding medication side effects, the ALJ again found the record lacking routine reports to Plaintiff's providers or changes in medication therapy to address intolerable side effects.[168]

Regarding the VA service-connected disability rating of 100 percent, the ALJ devoted a lengthy paragraph supporting his decision to give it partial weight.[169]  The ALJ explained that the disability determination process of the VA is "fundamentally different" from that of the SSA, noting, in particular, that the VA "does not make a function-by-function assessment of an individual's capabilities . . . or determine whether the [individual] is able to

---

[166]    Tr. 41.

[167]    Tr. 39-40.

[168]    See Tr. 40.

[169]    See id.

perform either his past relevant work or other work that exists in significant numbers in the national economy[.]"[170]  Instead, the ALJ continued, the VA disability program "compensat[es] for conditions incurred while in the service."[171]  The ALJ then explained how the difference affected Plaintiff's determination:

> The objective evidence and other evidence in this record shows [Plaintiff] has significant limitations due to degenerative disc disease and PTSD but that these limitations are insufficient to prevent the claimant from sustaining a range of sedentary unskilled work requiring limited contact with others and no public interaction. The evidence in this record also does not sustain limitation for Social Security purposes by some of the impairments deemed limiting by the VA. Thus, [Plaintiff] is considerably limited by many of the impairments deemed disabling by the VA but these limitations are not disabling for Social Security disability purposes.[172]

In a separate paragraph, the ALJ addressed the substance of the examinations conducted by the VA in order to determine Plaintiff's disability rating.[173]  In addition to noting that the examinations predated Plaintiff's alleged onset date, the ALJ stated:

> Further, the evidence dating to the time at issue shows that some of these impairments have improved in response to treatment while others have not warranted active and ongoing treatment.  These are only limited type and quantity of findings with respect to some of these

---

[170]    Id.

[171]    Id.

[172]    Id.

[173]    See id.

30

impairments and a lack of findings as to others.[174]

The ALJ afforded the reviewing medical consultants' opinions limited weight, finding that they did not have the benefit of more recent medical evidence and the hearing testimony that indicated Plaintiff was limited to work at a sedentary rather than light exertional level.[175]

The ALJ determined that the vocational expert's testimony was consistent with the information contained in the DOT and that the vocational expert was authorized, based on "his education, training and experience[,]" to offer the additional testimony on customary employer tolerances.[176]   Relying on the vocational expert's testimony, the ALJ found Plaintiff unable to perform his past work but able to perform jobs that existed in significant numbers in the national economy.[177]  The ALJ specifically identified optical goods assembler, table worker, and medical products assembler.[178] Therefore, the ALJ found that Plaintiff was not disabled at any time from November 27, 2016, the alleged onset date, through June 12, 2018, the date of the ALJ's decision.[179]

---

[174]   Id.

[175]   See Tr. 41.

[176]   See Tr. 43.

[177]   See Tr. 41-42.

[178]   See Tr. 42-43.

[179]   See Tr. 43.

On August 20, 2018, Plaintiff appealed the ALJ's decision.[180] On October 24, 2018, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[181]   After receiving the Appeals Council's denial, Plaintiff timely sought judicial review of the decision by this court.[182]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).  Under the applicable legal standard, a claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(a); see also

---

[180]    See Tr. 16, 18, 207-08.

[181]    See Tr. 1-5.

[182]    See Tr. 2; Doc. 2, Pl.'s Complaint.

Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520.  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

## B.  Substantial Evidence

Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Biestek v. Berryhill, ____ U.S. ____, 139 S. Ct.

1148, 1154 (2019)(internal quotations marks omitted).   "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." Id.  It only requires "more than a mere scintilla." Id.

The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.   42 U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  See Salmond v. Berryhill, 892 F.3d 812, 819 (5th Cir. 2018).   In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).   In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless. Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.   Plaintiff asserts that the ALJ's decision contains the following errors:

> (1)   The ALJ erred in only giving partial weight to [Plaintiff's] V[A] rating.

34

(2)     The ALJ erred in discrediting Plaintiff's testimony regarding his back impairment because [he] found it "hard to believe."

(3)     The ALJ erred in [his] determination that Plaintiff's impairment failed to equal a [L]isting.

(4)     The ALJ violated [Social Security Ruling ("SSR")] 96-3p in finding [that] Plaintiff's knee impairments [we]re not severe.

(5)     The ALJ's findings at step four are not supported by substantial evidence.[183]

(6)     The ALJ [e]rred in [d]etermining Plaintiff's RFC[.][184]

Plaintiff restates the Listing argument and significantly expands the RFC argument in his response to Defendant's motion.  In the discussion below, the court addresses Plaintiff's arguments in a different order than listed above.

**A.    <u>Severity of Knee Impairments</u>**

At step two of the disability analysis, an ALJ considers whether the claimant has a medically determinable impairment or combination of impairments that are severe.  <u>See</u> 20 C.F.R. § 404.1520(c); 42 U.S.C. § 423(d)(2)(A), (B).  Severity is determined by whether the impairment or combination of impairments significantly limits the claimant's physical or mental ability to

---

[183]    Although Plaintiff presented this argument as a challenge to the ALJ's findings at step four, Plaintiff's discussion addressed the ALJ's step-five determination that Plaintiff could perform other jobs in the national economy. <u>See</u> Doc. 14, Pl.'s Cross-Mot. for Summ. J. pp. 1, 12-13.  The court notes that the ALJ found in favor of Plaintiff at step four.  <u>See</u> Tr. 41-42.

[184]    Doc. 14, Pl.'s Cross-Mot. for Summ. J. p. 1.

perform basic work activities; an impairment or combination of impairments is not severe when evidence establishes only a slight abnormality that would only have a minimal effect on the claimant's ability to work.  See SSR 96-3p, 1996 WL 374181, at *2; SSR 85-28, 1985 WL 56856, at *3.

> A determination that an individual's impairment(s) is not severe requires a careful evaluation of the medical findings that describe the impairment(s) (i.e., the objective medical evidence and any impairment-related symptoms)[] and an informed judgment about the limitations and restrictions the impairment(s) and related symptom(s) impose on the individual's physical and mental ability to do basic work activities.

SSR 96-3p, 1996 WL 374181, at *2.

Plaintiff argues that the ALJ violated SSR 96-3p because he did not find Plaintiff's knee pain to be a severe impairment "[d]espite the ample evidence of [Plaintiff's] knee impairments in the medical evidence of record."[185]  This is nothing more than hyperbole.

The ALJ gave careful, if not lengthy, evaluation of the absence of objective medical evidence of a knee injury, including negative x-rays, and determined that it was not a medically determinable impairment.  As indicated at the start of this opinion, the record contains no time-relevant medical evidence of a knee condition.  Plaintiff cites the VA disability examinations conducted months before the alleged onset date as evidence of a

---

[185]    Id. p. 11.

severe knee impairment. Those records, even if they were considered relevant to Plaintiff's condition during the alleged disability period, show only minor issues requiring no ongoing treatment. Moreover, Plaintiff himself sought no treatment for his knee condition. For example, in January 2018 when he reported no fewer than twenty-seven symptoms and conditions, he did not mention knee pain. At that appointment and one in July 2017, the provider documented full strength of Plaintiff's lower extremities.

Plaintiff also points to his use of a cane for lower back and knee pain to "offload weight from his knees."[186] Although Plaintiff reported using a cane, he did not use or report using it on every occasion and indicated that it was not prescribed by a doctor.[187] Plaintiff's subjective complaints to the SSA notwithstanding, neither the objective medical evidence nor Plaintiff's own reports to treatment providers indicate that Plaintiff's knee pain caused more than a slight abnormality with minimal effect on his ability to work.

The ALJ did not err in finding that Plaintiff's knee condition

---

[186]   Id. (citing Tr. 418, which indicates that, as of May 2016, the cane usage was "to offload weight on *back and* knees" and that the only significant diagnostic testing/imaging of the right knee showed no degenerative or traumatic arthritis). Plaintiff also cites the May 2016 knee evaluation as evidence that Plaintiff could run no further than 100 yards without knee pain, a feat that would not be achievable for someone relying on a cane to ambulate and one that emphasizes the minimal effect of his knee pain on the ability to perform work activities. See id. (citing Tr. 419).

[187]   At the hearing, the ALJ did inquire whether a cane would interfere with Plaintiff's ability to perform the occupations cited by the vocational expert, who opined that there would be no diminution in the pool of other jobs Plaintiff could perform. That information, however, did not inform the ALJ's decision at step two.

was not a severe impairment.

## B.  **Listing 12.15 for Post Traumatic Stress Disorder**

The Listings "describe[] for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of [his] . . . age, education, or work experience." 20 C.F.R. § 404.1525(a).  If the requirements of any Listing are met or equaled by an individual's impairment, the individual is deemed presumptively disabled.  See Whitehead v. Colvin, 820 F.3d 776, 780-81 (5th Cir. 2016); see also 20 C.F.R. § 404.1525(c).  Plaintiff bears the burden of showing that his impairment meets or equals specified criteria.  See Whitehead, 820 F.3d at 781.

Listing 12.15 concerns trauma- and stressor-related disorders and requires that Plaintiff's impairment satisfy the criteria of paragraphs A and B or paragraphs A and C below:

A. Medical documentation of all of the following:

1. Exposure to actual or threatened death, serious injury, or violence;
2. Subsequent involuntary re-experiencing of the traumatic event (for example, intrusive memories, dreams, or flashbacks);
3. Avoidance of external reminders of the event;
4. Disturbance in mood and behavior; and
5. Increases in arousal and reactivity (for example, exaggerated startle response, sleep disturbance).

AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

1. Understand, remember, or apply information.

2. Interact with others.
3. Concentrate, persist, or maintain pace.
4. Adapt or manage oneself.

OR

C. Your mental disorder in this listing category is
"serious and persistent;" that is, you have a medically
documented history of the existence of the disorder over
a period of at least 2 years, and there is evidence of
both:
1. Medical treatment, mental health therapy, psychosocial
support(s), or a highly structured setting(s) that is
ongoing and that diminishes the symptoms and signs of
your mental disorder; and
2. Marginal adjustment, that is, you have minimal
capacity to adapt to changes in your environment or to
demands that are not already part of your daily life.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.15 (internal

citations omitted).

The Listing provides examples of the abilities to be

contemplated in each of the four areas of mental functioning

identified in paragraph B. See 20 C.F.R. Pt. 404, Subpt. P, App.

1, 12.00E. The examples are intended to "illustrate the nature" of

each area, but documentation of all examples is not required. Id.

The Listing directs assessment of the individual's
ability to use each of the paragraph B areas of mental
functioning in a work setting[,] . . . consider[ing], for
example, the kind, degree, and frequency of difficulty
[the individual] would have; whether [the individual]
could function without extra help, structure, or
supervision; and whether [the individual] would require
special conditions with regard to activities or other
people[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00F(1).

Based on the medical and non-medical evidence, the

individual's limitation in each area is rated on a five-point

scale: (1) none; (2) mild; (3) moderate; (4) marked; and (5)
extreme.  20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00F(2), (3)(a).
Moderate limitation means that the individual's functioning in the
area is fair. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00F(2)(c).
For marked, the individual must be seriously limited, and, for
extreme, the individual must be unable to function in the area at
all.  20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00F(2)(d-e).

> Limitation of an area of mental functioning reflects the
> overall degree to which [the individual's] mental
> disorder interferes with that area.  The degree of
> limitation is how [the SSA] document[s] [its] assessment
> of [the individual's] limitation when using the area of
> mental functioning independently, appropriately,
> effectively, and on a sustained basis.  It does not
> necessarily reflect a specific type or number of
> activities, including activities of daily living, that
> you have difficulty doing.  In addition, no single piece
> of information . . . can establish the degree of
> limitation of an area of mental functioning.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00F(3)(d).

To show medical equivalence, Plaintiff's PTSD must be "at
least equal in severity and duration to the criteria of [the
Listing]." 20 C.F.R. § 404.1526(a).  When the individual does not
exhibit one or more of the required findings or one or more of the
findings does not meet the required severity, the individual's
impairment is medically equivalent to the Listing only if other
findings related to that impairment are "at least of equal medical
significance to the required criteria."  20 C.F.R. §
404.1526(b)(1)(ii).  At the hearing decision level, the ALJ is
responsible for deciding whether an impairment is medically

equivalent to a Listing.  20 C.F.R. § 404.1526(e)(3).

Plaintiff only challenges the ALJ's findings on the paragraph B criteria.  Paragraph B, by its own terms, requires that the evidence demonstrates marked limitation in two areas of mental functioning or extreme limitation in one area.  Plaintiff argues that the ALJ discussed only whether Plaintiff's condition met a Listing, not whether it equaled one.  The argument is unsustainable.

To succeed on his argument, Plaintiff bears the burden of pointing to findings that demonstrate equal medical significance to marked limitations in two areas or extreme limitations in one.  Rather than point to findings that show greater severity, Plaintiff argues against the ALJ's interpretation of the evidence and assessment of Plaintiff's functionality.  To wit, Plaintiff addresses evidence upon which the ALJ relied, providing a different interpretation and accusing the ALJ of taking "a slanted view," cherry-picking evidence, weaving a single statement "into a damning and erroneous narrative," "simply grasping at straws," and writing the decision in "a preposterous way."[188]

To the contrary, the ALJ addressed each of the four areas of mental functioning and discussed evidence supporting his conclusions that Plaintiff was moderately limited in three areas and mildly limited in one.  The ALJ cited evidence that supported

---

[188]   Doc. 14, Pl.'s Cross-Mot. for Summ. J. pp. 7, 9-10; see also id. pp. 6, 8, 11.

41

his conclusions, and, as that evidence amounted to more than a mere scintilla, it is substantial evidence.  The ALJ fulfilled his responsibilities on this front.

Plaintiff also argues, "because the ALJ declined to send the claimant for a consultative examination, the ALJ's determination of Plaintiff's limitations was based exclusively on [his] own reading of Plaintiff's mental health medical records."[189]  This is not a winning argument, in part because the ALJ evaluated more than just the medical records; he also considered inconsistencies between the medical records and Plaintiff's subjective testimony, as well as Plaintiff's self-reported ADLs.  Furthermore, the ALJ had the benefit of three psychiatric consultants who all assessed Plaintiff to be no more than moderately limited in any area of mental functioning.[190]

Additionally, when the SSA attempted to schedule a consultative examination before the review on reconsideration, Plaintiff and his attorney agreed that it may not be necessary because of more recent evidence that was submitted.  Those records were considered by the ALJ.  As the medical record provides sufficient information on Plaintiff's condition, the court finds no

---

[189]     Doc. 16, Pl.'s Resp. to Def.'s Cross-Mot. for Summ. J. p. 3.

[190]     Although the ALJ did not give full weight to their opinions on the basis that they did not have the benefit of the most recent evidence, their assessments covered a significant portion of the alleged period of disability and provided insight into the interpretation of the medical evidence and application of Listing 12.15.

consultative examination was needed, a conclusion that the ALJ also must have reached.[191]

The ALJ did not err in determining that Plaintiff's PTSD condition was not at Listing level.

## C.  **Plaintiff's Testimony**

SSR 16-3p, 2016 WL 1119029, at *2, explains that "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability."  Even so, an ALJ cannot ignore statements of symptoms but, rather, must evaluate them according to the two-step process set forth in the regulations: (1) consideration of "whether there is an underlying medically determinable physical or mental impairment[] that could reasonably be expected to produce an individual's symptoms, such as pain;" and (2) evaluation of "the intensity and persistence of the symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities."  Id.  The court must give deference to the ALJ's evaluation of the plaintiff's subjective complaints if it is supported by substantial record evidence.   See Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990).

Plaintiff argues that the ALJ discredited Plaintiff's

---

[191]     Indeed, the record contained sufficient and consistent medical evidence on which the ALJ was able to determine whether Plaintiff was disabled. See 20 C.F.R. § 404.1520b (explaining how the SSA considers evidence and what steps it takes if the record evidence is insufficient and/or inconsistent).  The only inconsistent evidence in this record is the subjective testimony of Plaintiff and his wife, as discussed in the following section.

testimony overall based on one deception to Dr. Jones despite Plaintiff's explanation at the hearing as to why he lied.   In Plaintiff's words:   "[T]he ALJ [took] this one admitted deception on [Plaintiff's] part, done to avoid further spinal injections which are undoubtedly painful[] and use[d] it to cast doubt on every single statement made by [Plaintiff] to his doctor."[192] Plaintiff insists, "The ALJ's treatment of Plaintiff's testimony is callous and judgmental and should not be an accepted way for ALJs to conduct themselves."[193]   Again, Plaintiff sinks to hyperbole.

The ALJ, in fact, did not discredit all of Plaintiff's testimony on the basis of "one admitted deception."[194]   Rather, the ALJ followed the requirements of the regulations by setting out the two-step process for evaluating subjective symptoms and following its mandate.   In his decision, the ALJ contrasted for each severe impairment Plaintiff's descriptions of pain and functional limitations found in his and his wife's function reports and hearing testimony with the medical evidence.   For example, the ALJ noted more than once in the decision that Plaintiff's subjective complaints were disproportionate to the limited treatment history and medically abnormal objective findings.   The ALJ similarly found Plaintiff's wife's subjective perceptions to be not wholly

---

[192]   Doc. 14, Pl.'s Cross-Mot. for Summ. J. p. 5.

[193]   Id. p. 6.

[194]   Id. p. 5.

44

consistent with the medical and other evidence in the record. Others of Plaintiff's complaints, according to the ALJ, were recorded as controlled by medication or other conservative treatment or did not require active and ongoing treatment.

Not only did the voluminous subjective information provided Plaintiff and his wife lack consistency with the objective medical record, that information covered a wide spectrum of capability, was inconsistent with reports that Plaintiff provided his treatment providers, and was internally inconsistent, all over a relatively short period of alleged disability.  According to some of the reports, Plaintiff could play games with the children, care for the infant, vacuum and dust, work on his automobile, care for his personal hygiene, shop online, pay bills, walk for ten to fifteen minutes, manage his medication, and attend doctor appointments on his own.  Other reports describe an individual capable of virtually no movement, no personal hygiene, and no interaction with the world.

In light of the inconsistencies within their own representations and with the record as a whole, the ALJ's expressed doubt as to the genuineness of Plaintiff's hearing testimony justifying allegedly false reports of improvement was hardly callous and judgmental.  Rather, it was a fair assessment of Plaintiff's subjective testimony and was supported by substantial evidence.

Because the ALJ followed the two-step process in determining the intensity, persistence, and limiting effects of Plaintiff's symptoms, the ALJ committed no error.  Because substantial evidence supports his conclusion, the determination is entitled to deference.

**D.  <u>Weight Given VA Rating</u>**

The VA and the SSA are governmental agencies that separately administer programs to provide disability benefits.  <u>Compare</u> 38 C.F.R. §§ 4.1-4.31 (explaining the VA's procedures for rating disabilities), <u>with</u> 20 C.F.R. §§ 404.1501-404.1599 (explaining the SSA's procedures for determining disability).  The programs employ different criteria in analyzing disability.  <u>See Chambliss v. Massanari</u>, 269 F.3d 520, 522 (5th Cir. 2001).

Although a disability determination by another governmental agency is not binding on the SSA, such a determination "is evidence that is entitled to a certain amount of weight and must be considered by the ALJ."  <u>Id.</u>; <u>see also</u> 20 C.F.R. § 404.1504 (discussing disability determinations by other organizations and governmental agencies).  An ALJ may discount a VA rating if valid reasons are cited.  <u>See Chambliss</u>, 269 F.3d at 522 ("ALJs need not give 'great weight' to a VA disability determination if they adequately explain the valid reasons for not doing so.").

"An ALJ's disagreement with the VA's finding of disability is not reversible error if the record reflects consideration of that

finding." Allison v. Berryhill, No. 1:16-CV-0170-BL, 2018 WL 1274853, at *6 (N.D. Tex. Feb. 16, 2018)(unpublished) (quoting Duke v. Colvin, No. 5:16-CV-151-DAE, 2016 WL 6651394, at *5 (W.D. Tex. Nov. 10, 2016)(unpublished)). However, reversible error is found when the "ALJ fails to consider the disability rating and explain [his] reasons for discounting it." Id. (quoting Rasco v. Berryhill, No. 4:17-CV-946, 2018 WL 587948, at *4 (S.D. Tex. Jan. 5, 2018)(unpublished)).

Plaintiff argues that the ALJ did not give sufficient weight to the VA rating and erred in how he evaluated the examinations underlying that rating. The court disagrees.

Here, the ALJ clearly considered the VA rating because he discussed it. The ALJ explained the reasons that he decided to afford it only partial weight, discussing the significant differences between the two disability programs and how those differences affected the determination, noting that the medical examinations on which the rating was based took place prior to the alleged onset date, and concluding that the record before the SSA lacked support for the degree of limitation reflected in the VA's rating. The ALJ's explanation is more than sufficient to meet legal requirements.

The ALJ was not required, as Plaintiff argues, to apply the regulatory factors in 20 C.F.R. § 404.1527(c) (addressing the proper consideration of medical opinions) to the VA's disability

examinations.  Other than citing that regulation itself, which does not specifically mention VA disability examinations, Plaintiff cites no legal support for this argument.  In fact, the legal authority sets the bar much lower, requiring only that the ALJ consider the VA rating and explain the reasons for discounting it.[195]  Moreover, the underlying examinations were not time relevant.

The ALJ did not err in his consideration of the VA disability rating.

**E.   RFC Determination**

A claimant's RFC is his remaining ability to work despite all of the limitations resulting from his impairments.  See 20 C.F.R. § 404.1545(a); Villa, 895 F.2d at 1023.  The ultimate responsibility for determining this issue lies with the ALJ.  20 C.F.R. § 404.1527(d)(2); Taylor v. Astrue, 706 F.3d 600, 602-03 (5th Cir. 2012).  Even so, the ALJ must evaluate every medical opinion in the record.  See 20 C.F.R. § 404.1527(c).

Plaintiff argues that the ALJ "d[id] not adopt any of the given medical opinions" and that the result is that it is unclear how he reached his RFC determination.[196]  Plaintiff complains

---

[195]   Defendant cited Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5,844-01 (Jan. 18, 2017), 2017 WL 168819, which revised the regulations to clarify that the SSA adjudicators need not provide analysis about disability decisions of other governmental agencies or nongovernmental entities.  Be that as it may, the ALJ did provide analysis here as to the weight given the VA rating and was under no obligation to discuss the factors listed in 20 C.F.R. § 404.1527.

[196]   Doc. 14, Pl.'s Cross-Mot. for Summ. J. p. 14.

specifically that the ALJ only assigned partial weight to the VA rating, that he gave the underlying VA examinations and Plaintiff's wife's function report weight to the extent they were consistent with the ALJ's findings, and that he failed to specify the weight given the medical consultants.  Plaintiff also argues that the ALJ's RFC determination does not agree with his discussion of the medical opinions.[197]  These arguments are not on the mark.

The ALJ discussed the treatment notes of the treating physicians, essentially giving them full weight.  The problem for Plaintiff is that the physicians' objective findings and conservative treatment plans support the ALJ's RFC determination. As discussed above, the ALJ explained the reasons he afforded the VA rating only partial weight.  The ALJ considered the underlying examinations even though they were not time relevant.  Regarding Plaintiff's wife's function report, the ALJ assigned it partial weight, finding it and Plaintiff's subjective reports inconsistent with the amount and degree of treatment.  Finally, the ALJ found the medical consultants' opinions entitled to only limited weight

---

[197]    In his response, Plaintiff argues that the ALJ ignored certain evidence and discussed only the evidence favorable to his determination.  The court reminds Plaintiff that the ALJ is not required to discuss every single piece of evidence and that the ALJ's decision need be supported by no more than substantial (a mere scintilla of) evidence.  See Giles v. Astrue, 433 F. App'x 241, 251 (5th Cir. 2011)(unpublished)("[T]here will always be some evidence that is not specifically discussed in the Commissioner's decision.  Our review is limited to examining whether the decision to deny benefits is supported by substantial evidence in the record[.]").  In support of his decision, the ALJ cited more than a scintilla of evidence.  No matter how much evidence exists to the contrary, a decision supported by substantial evidence should not be disturbed.  See 42 U.S.C. § 405(g).

because the consultants lacked the more recent medical information, which, as it turned out, led the ALJ to a more limited RFC than those of the medical consultants.[198]

As discussed in other sections of this opinion, the ALJ's RFC determination is supported by the gaps in medical treatment, the conservative nature of treatment, the lack of objective findings to support the alleged severity of Plaintiff's conditions, the inconsistencies within the subjective reports and between the subjective reports and the medical evidence, and the self-reported ADLs that reflected periods of time in which Plaintiff was quite capable of work-related activity.

The ALJ did not err in his RFC determination, and substantial evidence supports his conclusion.

**F.   Step Five**

At step five of the disability analysis, an ALJ considers whether the claimant is able to make an adjustment to other work. See 20 C.F.R. § 404.1520(g).   An individual will be determined disabled if his impairments are so severe that he can perform neither his previous work nor "engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, . . . whether a specific job vacancy exists for

---

[198]     Plaintiff incorrectly argues that the ALJ "fail[ed] to specify the amount of weight assigned to the [consultants'] opinions." Doc. 14, Pl.'s Cross-Mot. for Summ. J. p. 14.

him, or whether he would be hired if he applied for work." 42
U.S.C. § 423(d)(2)(A).

Vocational experts are valuable resources because they are
"familiar with the specific requirements of a particular
occupation, including working conditions and attributes and skills
needed." Carey v. Apfel, 230 F.3d 131, 145 (5th Cir. 2000)(quoting
Fields v. Bowen, 805 F.2d 1168, 1170 (5th Cir. 1986)); see also
Dominguez-Herrera v. Astrue, 334 F. App'x 651, 654 (5th Cir.
2009)(unpublished)(quoting Vaughan v. Shalala, 58 F.3d 129, 132 (5th
Cir. 1995)). Although the SSA relies primarily on the DOT for
"information about the requirements of work in the national
economy," the SSA turns to vocational experts and vocational
specialists "to resolve complex vocational issues." SSR 00-4p,
2000 WL 1898704, at *2.

The ALJ is required to ask a vocational expert if his
testimony about the requirements of a job conflicts with
information in the DOT and, if it does, to obtain a reasonable
explanation for the conflict before relying on the vocational
expert's testimony instead of the DOT information. See SSR 00-4p,
2000 WL 1898704, at **2, 4. Absent an unresolved conflict, the ALJ
may rely on the vocational expert's testimony as substantial
evidence of an individual's ability to perform certain jobs as long
as the ALJ posed a hypothetical question that incorporated all of
the impairments that the ALJ recognized as supported by the record

and the claimant was given an opportunity to correct errors or
omissions in the hypothetical question.   See SSR 00-4p, 2000 WL
1898704, at *4; Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir.
1994).

Plaintiff cites Gross v. Colvin, 213 F. Supp.3d 229, 234-236
(D. Mass. 2016), as support for the argument that:

> the [vocational expert] in this case failed to give any
> specific calculus for how [he] estimated the available
> jobs considering the numerous limitations Plaintiff has.
> There is no discussion whatsoever about how the reduced
> RFC affected the number of the listed occupations the
> [vocational expert] opined would still be available to
> Plaintiff.[199]

In support of this argument, Plaintiff offers two ways in which the
vocational expert failed to be sufficiently detailed.   The first
argument concerns the ALJ's determination that Plaintiff could lift
ten pounds occasionally and less than ten pounds frequently.
Plaintiff insists that the ALJ should have elicited testimony from
the vocational expert regarding Plaintiff's inability to perform
the full range of sedentary work, mistakenly assuming that
sedentary work requires the ability to lift twenty pounds
occasionally and ten pounds frequently.   However, those lifting
requirements define light work; sedentary work requires the ability
to lift no more than ten pounds at a time and to lift or carry
"articles like docket files, ledgers, and small tools."  20 C.F.R.
§ 404.1567(a)-(b).  The ALJ did not impose a lesser lifting ability

---

[199]     Doc. 14, Pl.'s Cross-Mot. for Summ. J. p. 12.

than recognized under sedentary work.

The second way in which the vocational expert failed to be sufficiently detailed, according to Plaintiff, was that he offered no testimony on the limitation in the ALJ's hypothetical question that Plaintiff be able to change positions after thirty to sixty minutes.   Relying on <u>Gross</u>, an out-of-circuit district court opinion, Plaintiff argues that the ALJ should have elicited testimony about how that limitation eroded the number of jobs available.

<u>Gross</u> addressed a situation where the ALJ's RFC placed the claimant's capability between light and sedentary.  <u>See</u> <u>Gross</u>, 213 F. Supp.3$^{d}$ at 231, 234.   The court was concerned that the vocational expert's testimony did not clearly explain the methodology by which he accounted for the reduced range of light exertion.  <u>See</u> <u>id.</u> at 234.   The court explained:   "While the hypothetical [question] posed by the ALJ asked the vocational expert to assume a two hour walking or standing limit, it is unclear from the vocational expert's testimony how he accounted for that limit."  <u>Id.</u>   The court recounted that the vocational expert acknowledged variability in terms of the kinds of jobs available within an occupation and offered a conservative estimate by cutting the number of available jobs in half and further explained that he would typically "sort of plot this variability on something like a normal curve . . . [with] outliers on either end."  <u>Id.</u> at 234-35.

53

The court also noted that the vocational expert stated that the reduction was based on general experience, on actual observation of how the jobs were being performed, on the DOT, and on other resources from the Department of Labor.  See id.  However, that was insufficient for the court, which wanted "a specific calculus for how [the vocational expert had] estimated the jobs available when considering [the claimant's] specific exertional limits."  Id.

This court finds that, under SSA regulations and rulings, as well as Fifth Circuit case law, that degree of explanation is unnecessary.  Vocational experts are entitled to rely on their knowledge and experience in estimating the reduction in job availability based on limitations presented in the ALJ's hypothetical question without providing "a specific calculus" for each exertional or nonexertional limitation that potentially erodes the job pool.  To find otherwise would delay the process by undermining the very purpose for consulting these valuable and knowledgeable resources.  Moreover, the legal authority requires explanation only when the vocational expert's opinion differs from the DOT and not for determinations of how each limitation affects the claimant's ability to perform each cited job.

The ALJ did precisely what the law requires.  He presented a hypothetical question to the vocational expert that included all of the limitations the ALJ acknowledged as supported by the record. Based on that hypothetical question and a review of the medical

record and hearing testimony, the vocational expert offered three examples of jobs that Plaintiff could perform. Plaintiff's attorney, despite the opportunity, did not seek additional information as to how the vocational expert calculated the number of available jobs for the hypothetical individual. The vocational expert's testimony is substantial evidence supporting the ALJ's decision.

The ALJ did not err in relying on the vocational expert's testimony without eliciting a specific calculus for the vocational expert's analysis of a change-of-position requirement.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such

objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 20th day of November, 2019.

Nancy K. Johnson
United States Magistrate Judge